(C. D. 1792)

HYMAN-MICHAELS CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 5, 1956)

*Freedman & Levy* (*Walter Freedman* of counsel) for the petitioner.
*George Cochran Doub*, Assistant Attorney General (*William J. Vitale*, trial attorney), for the respondent.

Before EKWALL, JOHNSON, and DONLON, Judges

JOHNSON, Judge: This is a petition, filed under section 489 of the Tariff Act of 1930, for the remission of additional duties assessed by reason of undervaluation of seamless steel tubes (oil-well casings),

exported from Holland on or about October 21, 1950, and entered at the port of Houston, Tex., on November 20, 1950. The merchandise was entered at $131.57 per 1,000 kilograms and appraised at $155 per 1,000 kilograms, net, packed. An appeal for reappraisement was taken, but was subsequently abandoned and dismissed.

At the trial, both parties introduced oral and documentary proof. Petitioner's witnesses were Solbert J. Barsy, vice president of Hyman-Michaels Co., the petitioner herein; J. I. Wattenberg, manager of the import department of International Expediters, Inc., customhouse broker at Chicago; Angelena Dunn, a former clerk and supervisor in the employ of W. R. Zanes & Company, customhouse broker at Houston; and Walter R. Zanes, Jr., vice president and assistant manager of the latter company. Defendant called Palmer F. King, formerly examiner in the appraiser's office at Houston, and now a liaison officer in the Division of Appraisement Administration, Bureau of Customs, and William O. Anderson, entry officer at Houston.

The following facts appear from the testimony and the exhibits herein. Hyman-Michaels Co. is an Illinois corporation, incorporated in 1911, and is a successor to a business that commenced in 1863. It is engaged in the purchase and sale of railroad equipment and parts and iron and steel products. In 1950, it imported a large quantity of steel products, but the merchandise involved herein was its first importation of oil-well casings. This transaction was initiated by a cable from one Alfred Wynschenk, Jr., of Dusseldorf, Germany, advising the petitioner of the availability of 200 tons of this commodity at $155 per metric ton, f. o. b. Rotterdam. This offer was accepted and a letter of credit established at the First National Bank of Chicago in the sum of $31,000 (petitioner's exhibit 1). Under the terms of the letter, Mr. Wynschenk was required to present certain documents, including a commercial invoice and a consular invoice, before receiving payment. Subsequently, he requested that the requirement for a consular invoice be deleted, but, after consultation with customs officials, petitioner found that it was necessary to provide a consular invoice and Wynschenk was so advised.

Thereafter, petitioner informed its customs broker in Chicago, International Expediters, Inc. (hereinafter called International Expediters) that it was making the purchase and requested that a broker in Houston be designated for the purpose of making entry there (petitioner's exhibit 5). W. R. Zanes & Co. (hereinafter called Zanes) was recommended by petitioner and was engaged by International Expediters to handle the matter (petitioner's exhibit 13). Zanes acknowledged and accepted the offer by letter (petitioner's exhibit 14).

On or about November 9, 1950, petitioner received from the bank the documents required under the letter of credit, including a commercial invoice (petitioner's exhibit 6) and a consular invoice (petitioner's exhibit 7). The commercial invoice, dated October 30, 1950, showed a price of $155 per metric ton (1,000 kilograms), but the consular invoice showed a price of $131.57 per metric ton. After discovering the disparity in the prices, petitioner addressed a communication to Wynschenk requesting an explanation (petitioner's exhibit 8).

Petitioner's next step was to send the documents it had received from the bank to International Expediters to be forwarded to the broker in Houston for the purpose of making entry. The letter of transmittal (petitioner's exhibit 9) states in part:

* * * You will observe that there is a difference between the consular invoice value and the commercial invoice value and at the moment we are unable to explain but have taken steps [to] find the reason for the difference and will advise you as soon as we receive a reply to our letter. If it is necessary, you may pay duty on the higher or lower values whichever the customs decides, subject to adjustment at a later date.

In accordance with this letter and with instructions given to Mr. Wattenberg by Harry Burkhart, petitioner's traffic manager, International Expediters wrote Zanes, stating (petitioner's exhibit 15):

It will be observed that the consular invoice value of $23060.27 is lower than the commercial invoice of $27166.85 and at the moment Hyman-Michaels are unable to explain the difference but they have written to the shipper about it and concerning this we attach copy of their letter of Nov. 13, 1950, addressed to us for your advice and for your submission to your Appraiser for verification of dutiable value.

If your Appraiser wishes estimated duty paid on the commercial invoice value it will be gladly deposited subject to adjustment later on or the other way around, whichever is preferable, and to this end we want you to telegraph us the amount of duty you need and on what basis it is being assessed and we will telegraph you funds.

Receipt of this communication was acknowledged by Mrs. Dunn in a letter stating that she was applying to the appraiser for values and would calculate the duty as soon as she received the information (petitioner's exhibit 16).

Mrs. Dunn prepared a submission sheet, and, according to her testimony, attached thereto the letter received from International Expediters and the consular and the commercial invoices. The submission sheet gives the number of the consular invoice, lists the invoice price as $131.57 per 1,000 kilograms, and states:

If additional information is received same will be furnished the Appraiser.

The submission sheet and attachments were sent to the collector's office by messenger and from there taken to the appraiser's office. They were returned with a notation "no current information," initialed "PFK." Mrs. Dunn took this to refer to Mr. King, whom she subsequently called to discuss the two values. On direct examination she testified:

We discussed the matter of the invoices, and he suggested at the time we enter the entry on the consular invoice, and in the event of a different value, we would be allowed to amend accordingly.

On cross-examination, Mrs. Dunn said that she mentioned to Mr. King that there was a commercial invoice, but he did not indicate that he had had any prior knowledge of it. In reply to a query as to whether Mr. King suggested that she use the consular invoice price instead of the commercial invoice price, she stated:

He didn't come out and say to use it. He said it could be used and we could amend if the values were different at a later date.

Entry was made on the basis of the value in the consular invoice. That invoice, but not the commercial invoice, was filed with the entry. Zanes then telegraphed International Expediters stating the amount that would have to be deposited, thus indicating that the entry had been made on the basis of the consular invoice value.

About that time, petitioner received a reply from Wynschenk in regard to the two invoices, in which it is stated (petitioner's exhibit 10):

Your letter of November 9th. I do not like to write about these things. In the correspondence months ago I explained to you why there is a difference. People in Holland do not like to sell for Dutch guilders only. The only way to get such material is to pay in advance the difference in Switzerland which I did. I could also have given you consular invoices for the higher amount but that entailed for me to make an extra trip to Holland. As you use these consular invoices for the assessment of the duty I thought it was better for us to give you the invoices for the lower amount.

As to this letter, the witness Barsy testified:

The reply which indicated that he got a low consular value because it might assist us in paying a lower duty than was proper was an outrageous suggestion, and we were indignant at it naturally. My reaction at the time was Mr. Wynschenk had pocketed the difference between $131. and $155.

Mr. Barsy then consulted Mr. Wattenberg, and the latter stated that the reply was not responsive and did not help determine what the true value of the merchandise was. He suggested that, since the papers had already been sent to Houston, with the request that entry be made at whichever value customs officials found proper, information from them be awaited. In the meanwhile, further efforts to

communicate with Wynschenk were made. As to these, Barsy testified:

> * * * Wynschenk was a free lance operator, and he floated about Europe, and it was difficult to tie him down. As a matter of fact, he would travel back and forth from Europe to New York, and we awaited—on one occasion, knowing that he was either enroute or preparing to go to New York, we awaited his arrival to discuss this matter with him in New York. The inquiries that we directed to him, he brushed off summarily.

In a letter, dated June 6, 1951 (petitioner's exhibit 18), Zanes wrote International Expediters asking that petitioner contact the shipper for information as to market value and stating that a request that the appraisement be withheld would be made. Barsy then suggested that Wattenberg write to Wynschenk directly, in the hope of obtaining a more satisfactory reply. Accordingly, Wattenberg communicated with Wynschenk requesting both the foreign and the export values of the merchandise. His letter paraphrased the applicable provisions of the tariff act, a copy of which was enclosed, and explained the need for definite information (petitioner's exhibit 19). In reply, Wynschenk wrote (petitioner's exhibit 20):

> Reference is made to your letter of June 27, 1951. I must advise you that the unit market value of the shipment is the same as mentioned in the Consular Invoice. This is the Dutch unit value and the export value at the time of shipment.

On being advised of this letter, petitioner directed that all documents, including Wynschenk's first evasive reply, as well as his second letter, be sent to the broker in Houston. These documents were transmitted, together with a letter from International Expediters, stating (petitioner's exhibit 21):

> We believe that the information in the attached communications tends to indicate that the value on date of exporation is the value as shown on the consular invoice. However, we are giving you all the facts for transmission to your Appraiser and now await your further advice.

On three occasions thereafter, on August 6, October 22, and November 16, International Expediters wrote Zanes inquiring about the status of the matter, but no reply was received until the end of November. At that time, Charles R. McDowell, vice president and manager of Zanes' Houston office, addressed a communication to International Expediters, in which he stated that the entry had not yet been liquidated. On December 4, Mr. McDowell, then preparing to leave on a vacation, took the papers which had been sent to him in July and gave them to Mrs. Dunn, with instructions to forward them to the appraiser, which she did. Until that time, she had not known of these papers.

The delay on the part of Zanes in transmitting the papers to the appraiser was explained by the witness Walter R. Zanes, Jr., as follows:

There was a tremendous amount of work and import at Houston during that time, and the subsequent work it brought to our company forced him [Mr. Mc-Dowell] to not only work nights, but he took work home with him. He was not able to secure the competent help that he needed to handle this business, and this file was on his desk, I assume it became into a file, and it just got misplaced during all that work.

\* \* \* \* \* \* \*

At the time we thought Mr. McDowell was in perfect health. He died in June, 1954 very suddenly, and after his death, I believe they performed an autopsy, and it was a malignant type of disease he contacted in the service while in the Far East. We believe he must have been ill a number of years before he died.

Petitioner heard nothing further about the matter until January 1952, when a customs agent called at the office to examine the files. With petitioner's full cooperation, the agent not only examined the files in petitioner's office but took them with him and had photostatic copies made. The file was returned about July 10, 1952, together with a letter, stating that petitioner's cooperation was appreciated (petitioner's exhibit 11).

In the meanwhile, petitioner received a notice that a penalty of $38,482 had been assessed under section 592 of the Tariff Act of 1930 for having filed a false invoice. An appeal was taken to the Secretary of the Treasury and the penalty against petitioner was remitted in full and that against Zanes reduced to $250 (petitioner's exhibit 12).

According to the official papers, the merchandise was appraised on January 22, 1952, but no notice of advance in value was sent to petitioner or its broker until June of that year. Mrs. Dunn testified that she and Mr. McDowell went to see the collector in the early summer of 1952 and were advised at that time that the shipment had been appraised.

Petitioner's witnesses each testified that there was no intention of deceiving the appraiser as to the value of the merchandise, concealing the facts, or defrauding the revenue.

Respondent's witness, Palmer F. King, testified that, at the time of this importation, he was an examiner in the office of the appraiser at Houston, Tex. He was familiar with the entry involved herein and had initialed the submission sheet submitted by the broker (respondent's exhibit A). He remembered that a consular invoice had been attached to it, but, to the best of his recollection, no other papers were annexed to it. He explained that if there had been a consular invoice and a commercial invoice attached, he would have taken cognizance of the different values and would have noted the one that appeared to be more correct.

Mr. King testified that he had had several conversations with Mrs. Dunn regarding the value of the merchandise but did not recall any specific one. He stated, however, that he did not suggest that she enter the merchandise at the consular invoice value and that in the event that there was any different value that she would be allowed to amend. He requested that further information as to value be submitted and, in December 1951, he received from Zanes' office a file of letters showing that there had been two invoices issued, one consular and one commercial, at different values. At that time, the papers had not yet gone to the appraiser and the entry could have been amended. No amendment was received in the appraiser's office.

The issue in this case, as in all remission cases, is whether the petitioner has shown by satisfactory evidence that the entry of the merchandise at a value less than that returned upon final appraisement was without any intention to defraud the revenue or conceal or misrepresent the facts or deceive the appraiser as the the value of the merchandise. *United States* v. *Fish,* 268 U. S. 607, 612. Satisfactory evidence consists of proof of the surrounding circumstances and conditions, together with a full and candid explanation of petitioner's conduct at the time of making entry, and before and subsequent thereto, showing that his action in making the entry at the lower value and his failure to amend were in good faith. Satisfactory evidence relative to such good faith means the amount of proof which would ordinarily satisfy an unprejudiced and reasonable mind. *United States* v. *Kenneth Kittleson and E. W. Rollow,* 43 C. C. P. A. (Customs) 31, C. A. D. 605; *Linen Thread Co.* v. *United States,* 13 Ct. Cust. Appls. 301, 305, T. D. 41220; *Syndicate Trading Co.* v. *United States,* 13 Ct. Cust. Appls. 409, 411, T. D. 41339; *United States* v. *Pennsylvania Salt Manufacturing Co.,* 26 C. C. P. A. (Customs) 232, 241–2, C. A. D. 22.

Each case must be decided upon the circumstances and conditions peculiar to it, but certain general principles have long been followed by our courts. The statement most frequently quoted is found in *Wolf & Co.* v. *United States,* 13 Ct. Cust. Appls. 589, 591, T. D. 41453, as follows:

\* \* \* Summarized, these adjudged cases announce certain fundamental facts which the petitioner must establish if he is to obtain relief: First, He must show that in undervaluing his goods he was acting in entire good faith; second, that there were no facts or circumstances known to the petitioner when he made his entry which would cause a prudent and reasonable person to question the correctness of the values given by him; third, that he has made to the collector in making his entry, a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported.

The petitioner is not the insurer of the correctness of the value of his goods; neither is he held to the strict rule that he must positively know their value. *Finsilver, Still & Moss* v. *United States,* 13 Ct.

Cust. Appls. 332, 336, T. D. 41250; *P. Pastene & Co. (Inc.)* v. *United States*, 21 C. C. P. A. (Customs) 69, 73, T. D. 46392. However, the burden rests upon him to make such proof as will show his good faith and lack of fraud and bad intent. "If he has made a case which shows his conduct in connection with the entry and valuation therein, to be entirely out of harmony and inconsistent with the existence of such fraud and bad faith, it should be regarded as satisfactory and sufficient for the purposes of the remedial provision." *Morris Rosenbloom & Co.* v. *United States*, 17 C. C. P. A. (Customs) 45, 50, T. D. 43336.

The undisputed evidence in the instant case shows that when petitioner received two invoices with differing values, it immediately, and before making entry, asked the shipper, Wynschenk, for an explanation. It forwarded both invoices to its Chicago broker, International Expediters, specifically pointing out that there was a difference in the values given. It directed that this be called to the attention of the Houston broker, Zanes, and that the matter be submitted to the appraiser and entry made at the value decided by customs officials. These instructions were duly transmitted to the Houston broker. Subsequently, petitioner received a letter from Wynschenk which made it think that the actual price of the merchandise was that stated in the consular invoice and that Wynschenk had pocketed the difference. It continued, however, in its efforts to get further information from Wynschenk.

The only disputed points in the record are whether the two invoices were submitted to the appraiser with the submission sheet before making entry, whether the two invoices were discussed with the examiner, and whether he suggested to Mrs. Dunn that she might make entry at the consular invoice value and amend later, if necessary. Mrs. Dunn was very positive in her testimony that these were the facts. The examiner remembered conversations with Mrs. Dunn, in which value was discussed, but did not recall seeing the commercial invoice with the submission sheet and stated that he did not make any suggestion that entry be made on the basis of the consular invoice value. However, appraisement was not made at the time and the examiner continued to ask for further information as to value, which is some indication that he had been advised that there might be a value other than that in the consular invoice.

Furthermore, when a second letter was received from Wynschenk, after International Expediters had explained to him the tariff definitions of foreign and export value, all of the correspondence was forwarded to Zanes for transmittal to the appraiser. Unfortunately, there was a delay upon the part of Zanes in submitting these papers, but they were received by customs officials before appraisal of the merchandise. The explanation, which has not been contradicted, that the delay was due to pressure of work and the ill health of

Mr. McDowell is not inconsistent with good faith on the part of petitioner or its brokers. Nor is the fact that the entry was not amended indicative of bad faith in the instant case, since all the facts were given to the appraiser before final appraisement. The letter of International Expediters (petitioner's exhibit 21) states that the information in the correspondence tends to show that the consular invoice value was correct but that further advice from Zanes after submittal of the papers to the appraiser was awaited. There may have been a difference of opinion between the petitioner or its brokers and the appraiser as to the value of the merchandise, but there is nothing to show that this was not an honest difference of opinion.

The record herein establishes that petitioner directed that all the facts in its possession be disclosed to customs officials; that those facts were so disclosed; that petitioner made inquiries as soon as it received the two invoices; and that such inquiries were continued and the result thereof given to customs officials. At the trial, there was a full and candid explanation of the conduct of petitioner and its brokers, at the time of entry, and before and subsequent thereto. The writer of this opinion conducted the trial at Houston and was impressed by the demeanor of petitioner's witnesses, which showed a willingness to present to the court a full disclosure of all pertinent facts.

We find that the entry of the merchandise herein at a less value than the final appraised value was without any intention to defraud the revenue of the United States or to conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise. The petition is granted. Judgment will be rendered accordingly.